UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>MARCUS HICKS,<br><br>Defendant. | Criminal Action No. 23-30029-MGM |

MEMORANDUM AND ORDER REGARDING MOTION TO SUPPRESS
(Dkt. No. 37)

September 3, 2024

MASTROIANNI, U.S.D.J.

## I. INTRODUCTION

Defendant, Marcus Hicks, moves to suppress incriminating evidence seized from his vehicle on November 21, 2022 by special agents and task force officers acting on behalf of the United States Drug Enforcement Administration ("DEA"). In addition, Defendant seeks to suppress incriminating statements made to DEA agents in the aftermath of the November 21 encounter. As grounds for the requested suppression, Defendant contends he was unlawfully seized by federal agents in violation of the Fourth Amendment to the United States Constitution; his vehicle was unlawfully searched without a warrant further violating his Fourth Amendment rights; and he was subject to a custodial interrogation without being given the constitutionally necessary warnings set forth in *Miranda v. Arizona*, 384 U.S. 436 (1966). In response, the government argues the DEA had probable cause to effectuate a warrantless search of Defendant's automobile; or, in the alternative, the DEA had a reasonable articulable suspicion that Defendant was engaged in criminal activity thereby justifying an investigatory detention pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968). As to Defendant's incriminating statements, the government asserts that Defendant was not subject to a custodial interrogation;

therefore, the *Miranda* warnings were unnecessary. Thus, according to the government, suppression of the physical evidence and Defendant's statements is not warranted.

For the following reasons, Defendant's motion to suppress is denied with respect to the physical evidence seized on November 21, 2022. Defendant's motion is also denied with respect to his incriminating statements made prior to being placed in a DEA vehicle. As to the incriminating statements made inside the DEA vehicle, the government failed to prove by a preponderance of the evidence that Defendant knowingly and voluntarily waived his *Miranda* rights. Accordingly, the incriminating statements made in the DEA vehicle are suppressed.

## II. FINDINGS[1]

On November 21, 2022, DEA Special Agent Richard Giroux ("Giroux") was parked in an unmarked police vehicle in front of 39 Montrose Street, Springfield, Massachusetts. Giroux was present on Montrose Street to undertake surveillance in support of an investigation unrelated to Defendant. At approximately 2:40 p.m., Giroux's attention was drawn to a Nissan SUV that pulled over and parked approximately forty feet further down Montrose Street—facing the same direction as Giroux's vehicle. Based on his visual observation, which was at times aided by binoculars, Giroux determined the Nissan contained two occupants. Approximately ten minutes later, Giroux observed an Acura MDX with only one occupant pull down Montrose Street and park. This Acura parked in front of 50 Montrose Street and was facing toward State Street—the opposite direction from Giroux's vehicle. This second vehicle was approximately ninety feet from Giroux's position.

Within seconds of the Acura's arrival, Giroux observed a male exit the driver's side door of the Nissan (the car directly in front of him) and cross Montrose Street to the front passenger window

---

[1] The court held an evidentiary hearing regarding this motion on May 15, 17, and 22, 2024. At this hearing, the parties presented live testimony by Giroux, Fontanella, Boyle, and Defendant. Unless otherwise noted, the court's findings of fact are based on the testimony elicited during this hearing, the exhibits presented during the hearing, and the court's assessment of the credibility of the witnesses.

of the Acura. The male from the Nissan leaned into the window of the Acura. Giroux identified the occupant of the Acura as the Defendant (at the time, Giroux was unaware of Defendant's name). He further observed the parties engage in a brief conversation. Following this discussion, Giroux watched Defendant twist backward toward the rear seat of the Acura. When Defendant subsequently turned back toward the front of the Acura, Giroux noted his fists were balled, as if he were holding a weighted object with both hands. Approximately thirty seconds after observing this behavior, Giroux watched the individual step back from the Acura and proceed back across Montrose Street to the Nissan. As the male walked back to the Nissan (and toward Giroux), Giroux noticed the individual was carrying a white "baggie"; but Giroux did not testify that he witnessed an actual hand-off of the "baggie," nor did he witness an exchange of money. Giroux did, however, watch the male with the "baggie" re-enter the Nissan and drive away, while Defendant exited his Acura and proceeded to enter 50 Montrose Street.

At this time, Giroux suspected he had witnessed an illegal narcotics transaction.[2] He came to this conclusion based on his training and experience—approximately three and a half years in law enforcement and completion of the DEA Academy's program in Quantico, Virginia. Giroux, therefore, contacted a second DEA agent, Special Agent Anthony Fontanella ("Fontanella"), to inform him of what he had witnessed.[3] After informing Fontanella, Giroux turned his attention back to observing 50 Montrose Street. At approximately 3:00 p.m., Defendant exited 50 Montrose Street with an elderly woman (subsequently identified as his grandmother). Defendant and his grandmother drove off in the Acura. Giroux informed Fontanella that he was going to initiate mobile surveillance

---

[2] In his testimony, Defendant did not deny narcotics were exchanged on Montrose Street. Instead, Defendant testified the substance he actually handed off was marijuana that he was giving away as a gift.

[3] Fontanella was working with Giroux to conduct surveillance of a location on Montrose Steet, but he was not stationed on Montrose Street itself.

of the vehicle. After hearing this, Fontanella put out a call to other members of the DEA task force in the greater Springfield area requesting assistance in surveilling Defendant's vehicle. As these officers worked their way toward Montrose Street, Fontanella began to follow Defendant's vehicle from Montrose Street to Mercy Medical Center ("Mercy"). Defendant parked his Acura at Mercy and escorted his grandmother inside for medical appointments. Meanwhile, Fontanella and Giroux took up observation of Defendant's vehicle from locations near the Mercy campus.

After approximately one hour in Mercy, Defendant and his grandmother returned to the Acura. Fontanella and Giroux followed the vehicle as it exited Mercy toward Liberty Street. In addition, responding to Fontanella's earlier radio call for assistance, Task Force Officer Brendan Boyle ("Boyle") joined the surveillance team.[4] Boyle assumed a position behind Defendant's vehicle as it traveled down Liberty Street until reaching a Dunkin Donuts located at 695 Liberty Street. Boyle followed Defendant into the Dunkin Donuts parking lot, where they both parked their vehicles, with Boyle's unmarked police vehicle directly next to Defendant's Acura. Giroux also pulled into the Dunkin Donuts parking lot; he parked directly next to Boyle's unmarked vehicle (one car away from Defendant's vehicle). A short time later Fontanella arrived; he parked next to Giroux (two cars away from Defendant's vehicle).

While Giroux and Fontanella pulled into the Dunkin Donuts parking lot, Boyle and Defendant exited their vehicles. Boyle walked around the back of Defendant's vehicle and approached the open driver side door. There, he encountered Defendant, who had just exited his vehicle as if to head toward the entrance of the Dunkin Donuts. Boyle testified that he detected the odor of marijuana coming

---

[4] Boyle is a detective with the Holyoke Police Department. He is detailed to DEA's western Massachusetts counter-narcotics task force.

from Defendant's vehicle,[5] which prompted him to initiate a conversation with Defendant by asking "what's the deal with the marijuana." Defendant informed Boyle that he smoked marijuana, at which point Boyle asked Defendant to step to the rear of his vehicle. Defendant testified to a similar version of events. However, according to Defendant, Boyle's initial question was not related to marijuana. Rather, Defendant testified Boyle wanted to speak to Defendant regarding the status of the Acura's inspection sticker because, as the parties agreed by stipulation, there were irregularities affecting the validity of the sticker. Ultimately, while the proffered versions of the initial interaction between Boyle and Defendant differ, the parties agree that Defendant and Boyle moved to the rear of Defendant's Acura. Once there, Giroux and Fontanella joined Boyle and Defendant.

As the four men stood around the Acura, Defendant verbalized his concern that he would be shot during the interaction with law enforcement. Boyle and Fontanella both separately assured Defendant that he would be safe during the interaction, while Giroux asked for Defendant's driver's license. Once Giroux received the license, Fontanella asked Defendant to explain what he had been up to that day. Defendant described driving his grandmother to Mercy for an appointment, but he failed to mention any part of the interaction observed by Giroux on Montrose Street. As this narrative was ongoing, Boyle walked to the driver side passenger door of Defendant's car and peered through the back window. He noticed a partially opened black duffel bag with a Ziploc bag protruding through the opening.[6]

After noticing this bag, Boyle stopped what he was doing and began to recite Defendant the *Miranda* warnings. Boyle testified he told Defendant as follows:

You have the right to remain silent. Anything you say can and will be used against a

---

[5] In contrast, Giroux and Fontanella testified that they did not notice any type of marijuana odor emanating from Defendant's vehicle.

[6] Boyle testified that he observed a Ziploc bag; but he did not testify that he observed any illicit substance in the Ziploc bag when he initially looked through the car window.

court of law. You have a right to an attorney. If you can't afford an attorney, one can
be provided for you. Again, at any point you wish to speak to an attorney, stop
answering questions, you may do so.

Giroux and Fontanella both testified they heard Boyle give Defendant these *Miranda* warnings.[7] This
interaction outside of the car was not custodial in nature; therefore, the *Miranda* warnings were not
required. Nevertheless, based on Boyle's testimony, as corroborated by Giroux and Fontanella's
testimony, the court finds the *Miranda* warnings were given.

In response, Defendant did not verbally acknowledge the *Miranda* warnings, let alone agree to
waive his rights. Rather, he asked the officers why he was being stopped. Instead of addressing this
question, Boyle asked Defendant for permission to search the black bag in the rear passenger seat of
the Acura. Defendant did not verbally consent to this search. Defendant did, however, immediately
walk toward the backseat and begin to reach inside the car, as if to grab the bag from the seat. Boyle
stopped Defendant from grabbing the bag because of concern it might contain a firearm. Defendant
testified that he did agree to let officers search the bag (and his car), but he explained that he only gave
this consent because the officers threatened to arrest him if he declined their request. Based on the
totality of the testimony presented, the court rejects Defendant's assertion that he was threatened with
arrest as not credible.[8]

As Boyle removed the bag from the backseat of Defendant's car, he also asked Defendant

---

[7] Defendant testified that he did not receive *Miranda* warnings from the officers. There was no signed
*Miranda* card or form with an acknowledgment that Defendant understood or waived these rights.
But, while it is a wise professional practice for federal agents to obtain a signed acknowledgment or
waiver to memorialize the *Miranda* warning, "neither a signed waiver of *Miranda* rights nor any other
form of documentation is required" to demonstrate the warnings were given. *United States v. Coombs*,
857 F.3d 439, 450 (1st Cir. 2017).

[8] In the affidavit supporting his motion, Defendant also asserted officers threatened to arrest him if
he did not consent to a search of his vehicle. These statements are found to be not credible, and the
testimony presented at the evidentiary hearing by all three officers directly contradicted the
Defendant's assertion.

what was in the bag. Defendant responded, "yayo."[9] Boyle testified that as he removed the bag from Defendant's car, he was able to observe a gallon Ziploc bag containing marijuana and several smaller "baggies" containing cocaine. As Boyle placed the bag on the trunk of his police vehicle it produced a metallic thud, prompting Boyle to ask what else was in the bag. In response to this noise and Boyle's question, Defendant stated, "he forgot that it was in there and that he was going to get a permit for it." While Defendant never went on to define what "it" was, Boyle subsequently removed a loaded Smith & Wesson nine-millimeter handgun. Defendant then indicated that he needed the firearm for "protection," but that he would "do anything" to get out of his predicament.

After uncovering the drugs and firearm from Defendant's bag, Giroux, Fontanella, and Defendant moved from the parking lot to the privacy of Fontanella's vehicle. There, Fontanella took the driver's seat with Defendant next to him in the front passenger seat and Giroux in the rear passenger seat. There was no repeat recitation or reference to Defendant's *Miranda* rights in the context of officers' questioning of Defendant in the DEA vehicle. However, Defendant proceeded to incriminate himself by revealing he purchased cocaine on a weekly to bi-weekly basis from a co-worker at the pizzeria where he previously worked. Specifically, Defendant stated he bought between fifty and one hundred grams of cocaine, sometimes on credit, for $2,500 an ounce. Defendant also revealed that he had purchased a Smith & Wesson nine-millimeter handgun from an individual who he did not personally know for approximately $300. Finally, Defendant agreed to cooperate with future DEA investigations into the narcotics trade in Springfield, Massachusetts.

---

[9] The parties agree this is a colloquial term for cocaine.

### III. DISCUSSION

**A.      The Physical Evidence**

*1.   Basis for the Stop*

As an initial matter, Defendant contends the DEA lacked a legal basis to initiate the seizure of his person in the parking lot of the Dunkin Donuts at 695 Liberty Street. The court does not find this contention persuasive.

The Fourth Amendment guarantees an individual right to be free from "unreasonable searches and seizures." U.S. Const. amend. IV. However, this "constitutional bedrock" protection "does not prohibit all searches and seizures but, rather, only those that are unreasonable." *United States v. Carmona*, 103 F.4th 83, 90 (1st Cir. 2024). To qualify as reasonable, the seizure of a person generally requires probable cause. *See United States v. Centeno-Gonzalez*, 989 F.3d 36, 44-45 (1st Cir. 2021). But, in *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court ruled that while the Fourth Amendment's protections "extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest," these brief investigatory stops are reasonable so long as "the officer's action is supported by reasonable suspicion to believe that criminal activity 'may be afoot.'" *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (first citing *Terry*, 392 U.S. at 9; and then quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). Thus, "[b]ecause the 'balance between the public interest and the individual's right to personal security' . . . tilts in favor of a standard less than probable cause," *Arvizu*, 534 U.S. at 273 (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975)), an investigatory stop may be initiated based on a "likelihood of criminal activity [that does] not rise to the level required for probable cause, and [which] falls considerably short of satisfying a preponderance of the evidence standard," *id.* at 274

(alteration added). As a "brief investigatory stop[] of a person," the rubric established in *Terry* and its progeny applies to govern the court's analysis.[10]

Under *Terry*, Defendant could be briefly detained in a manner commensurate with the circumstances giving rise to officers' reasonable suspicion. During this detention, officers may ask "question[s] based on [the] police officer's reasonable suspicion that the person is or has been engaged in criminal activity." *United States v. Brake,* 666 F.3d 800, 804 (1st Cir. 2011) (alterations added). Moreover, "[a] *Terry* stop is not necessarily a snapshot of events frozen in time and place"; rather, "such a stop can entail an ongoing process." *United States v. Ruidiaz,* 529 F.3d 25, 29 (1st Cir. 2008). For example, illegal parking may lead to detention as a suspect in a shooting, *see Ruidiaz,* 529 F.3d at 29-33, or failure to use headlights may lead to the detention and pat-frisk of a passenger suspected of

---

[10] In its briefing, the government contends that officers had probable cause to search Defendant's motor vehicle based on Giroux's observations, the odor of unburnt marijuana described by Boyle, and the presence of Ziploc bags in the back seat of Defendant's vehicle. Under the "automobile exception" to the Fourth Amendment's warrant requirement, police may search a car without a warrant so long as they have probable cause to believe the car contains contraband. *See United States v. Dion*, 859 F.3d 114, 131 (1st Cir. 2017). "Probable cause exists when 'the facts and circumstances as to which police have reasonably trustworthy information are sufficient to warrant a person of reasonable caution in the belief that evidence of a crime will be found.'" *Id.* at 131-32 (quoting *United States v. Silva*, 742 F.3d 1, 7 (1st Cir. 2014)). Here, the court does not find officers had sufficient probable cause to search Defendant's vehicle without a warrant. Giroux, based on his training and experience, believed he saw drugs handed to the person who approached Defendant's car. But he did not have prior information Defendant was engaging in narcotics trafficking, nor did he observe an exchange of money. *Cf. United States v. Flores*, 888 F.3d 537, 544 (1st Cir. 2018) (finding observation of a hand-to-hand narcotics transaction, which confirmed a previous tip regarding narcotics trafficking at a specific locale, supported probable cause). Moreover, Defendant's behavior after Giroux observed the alleged transaction would not bolster a finding of probable cause. Defendant did not appear to make repeated transactions, take counter-surveillance precautions while driving, or otherwise engage in conduct that would move Giroux's reasonable suspicion over the line to probable cause. Surveilling agents observed Defendant drive his grandmother to a doctor's appointment, while officers candidly testified, they were unaware of Defendant's identity or role in the western Massachusetts drug trade until after initiating an investigatory stop. Finally, the court notes the contradictory testimony regarding the smell of unburnt marijuana. Thus, the court accords the smell (or lack thereof) of marijuana little weight in its probable cause analysis. Accordingly, officers did not have probable cause to effectuate a warrantless search of the vehicle. However, as discussed, they did have a reasonable articulable suspicion that Defendant engaged in an illicit narcotics transaction thereby justifying a *Terry* stop.

being armed, *see United States v. Soares*, 521 F.3d 117, 118-19, 120-22 (1st Cir. 2008). As these cases illustrate, officers' actions that are "responsive to the emerging tableau" of the stop are justified under *Terry* because "while an officer's actions must bear some relation to the purpose of the original stop, he may shift his focus and increase the scope of his investigation by degrees if his suspicions mount during the course of the detention." *United States v. Chhien*, 266 F.3d 1, 6 (1st Cir. 2001) (citing *Terry*, 392 U.S. at 10).

The First Circuit has adopted a two-step analysis for "determin[ing] whether a brief investigatory stop—a *Terry* stop—passes constitutional muster." *Carmona*, 103 F.4th at 90. At step-one, the court must "ascertain whether the officer possessed 'reasonable, articulable suspicion of an individual's involvement in some criminal activity.'" *Id.* (quoting *Ruidiaz*, 529 F.3d at 28). Once the court finds step-one is met, step-two requires that "actions undertaken pursuant to that stop [were] reasonably related in scope to the stop itself unless the [officer had] a basis for expanding [his] investigation." *Id.* (quoting *Ruidiaz*, 529 F.3d at 28-29) (alteration in original). At each step, the inquiry requires the court to consider "the totality of the surrounding circumstances" before reaching a "practical, commonsense determination" of the validity of law enforcement's actions. *Ruidiaz*, 529 F.3d at 29.

As to step-one, the court finds the DEA had a reasonable and articulable suspicion that Defendant engaged in the sale of illicit narcotics on Montrose Street. Giroux, who the court finds highly credible, testified that he watched an individual walk up to Defendant's car window.[11] He then saw Defendant rotate to the back seat of his vehicle before turning back to address the individual at the window, in a manner that reasonably suggested to Giroux that Defendant had lifted a weighted object from the backseat. Following this movement, Giroux observed the individual immediately walk

---

[11] There was no evidence that Montrose Street was a known zone of high-intensity drug trafficking.

back toward his vehicle, while also noticing the individual was carrying a "baggie" containing a white substance. In Defendant's testimony, he denied reaching to the backseat of his vehicle and retrieving narcotics. Rather, Defendant claimed he had a pre-packaged "baggie" of marijuana in his glove compartment which he gave to the person from the Nissan. Defendant, however, did not dispute that the individual walked off with a "baggie." The court does not find Defendant's testimony credible. Giroux testified unequivocally that Defendant turned and retrieved a weighted object from the back seat of his car (where the duffel bag was located). Because the court credits Giroux's testimony, the court finds his observations on Montrose Street support the existence of a reasonable and articulable suspicion that Defendant had engaged in criminal activity—selling illegal narcotics. "Put another way, a reasonably prudent and experienced police officer would have recognized this behavior as consistent with the consummation of a drug deal." *United States v. Kormah*, No. CR 21-40012-TSH, 2023 WL 1490372, at *4 (D. Mass. Feb. 1, 2023) (internal quotation marks omitted).[12] Accordingly, step-one of the *Terry* inquiry is satisfied.

---

[12] In response, Defendant directs the court to three cases decided by the Massachusetts state courts— *Commonwealth v. Barreto*, 136 N.E.3d 697 (2019), *Commonwealth v. Clark*, 836 N.E.2d 512 (Mass. App. Ct. 2005), and *Commonwealth v. Ellis*, 426 N.E.2d 172 (Mass. App. Ct. 1981). These cases, he argues, stand for the proposition that an officer's firsthand observation of an alleged drug deal cannot, alone, provide a reasonable and articulable suspicion. But "[f]ederal law controls in federal prosecutions." *United States v. Rodriguez-Garcia*, No. 19-CR-10421, 2023 WL 5672699, at *4 (D. Mass. Sept. 1, 2023) (citing *United States v. Sutherland*, 929 F.2d 765, 769 (1st Cir. 1991)). And, the First Circuit has explicitly affirmed denial of motions to suppress where officers articulated a reasonable suspicion based on observation of a potential drug transaction. *See, e.g., United States v. Rabbia*, 699 F.3d 85, 89-90 (1st Cir. 2012); *United States v. Dubose*, 579 F.3d 117, 121-22 (1st Cir. 2009); *United States v. Trullo*, 809 F.2d 108, 111-12 (1st Cir. 1987). Moreover, as a matter of federal law, the Supreme Court has "deliberately avoided reducing [reasonable suspicion calculus] to a neat set of legal rules." *Arvizu*, 534 U.S. at 274 (internal quotation marks omitted and alteration added). Instead, "officers [are allowed] to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Id.* at 273 (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)) (alteration added). Here, the court finds Giroux's detailed observation of the alleged transaction, when combined with his specialized training in counter-narcotics operations, produced a "particularized and objective basis for suspecting legal wrongdoing." *Id.* (internal quotation marks omitted).

As to step-two, the court finds the actions taken by officers were reasonably related to the scope of the *Terry* stop. When Boyle arrived on scene, he asked merely to speak with Defendant. Boyle did not proceed with an attempt to immediately search Defendant's person, nor did he handcuff Defendant or pull a firearm on Defendant, nor did he otherwise take any coercive action toward Defendant. The parties disagree whether Boyle referenced the smell of marijuana or the validity of the inspection sticker on Defendant's Acura as the basis for initiating his interaction with Defendant. But all parties' testimony supports the court's conclusion that the initial actions taken by officers merely sought to initiate a conversation with Defendant. And the underlying basis for the *Terry* stop was Giroux's observations on Montrose Street, not an odor of marijuana or an invalid inspection sticker. The reasonable suspicion articulated by Giroux was sufficient to initiate a *Terry* stop—regardless of Boyle's asserted rationale—because "courts do not 'plumb[ ]' an officer's 'actual motive' in performing a reasonable-suspicion analysis." *United States v. McGregor*, 650 F.3d 813, 822 (1st Cir. 2011) (quoting *Bolton v. Taylor*, 367 F.3d 5, 7 (1st Cir. 2004)) (brackets in original); *see also United States v. Alkayisi,* 701 F. Supp. 3d 58, 69 (D. Mass. 2023) ("To justify a stop in the context of an investigation, moreover, an officer may rely on the collective or pooled knowledge of other officers."). The scope of the *Terry* stop was initially confined to an attempt to converse with Defendant; this conduct was reasonably related to investigating whether Defendant had engaged in a narcotics transaction on Montrose Street. For example, Giroux's request for Defendant's license and Fontanella's request that Defendant explain his activities before the stop are both actions reasonably related to the scope of the stop itself. As Giroux's question would ascertain Defendant's identity (then unknown), *see Hiibel v. Sixth Jud. Dist. Ct. of Nevada, Humboldt Cnty.,* 542 U.S. 177, 185-86 (2004), while Fontanella's question had the potential to quickly clarify whether officers mistook an innocent interaction on Montrose Street for something more sinister, *see United States v. Tanguay*, 918 F.3d 1, 5-6 (1st Cir. 2019). Consequently, no constitutional violation occurred when officers initially stopped and questioned Defendant.

Turning to Defendant's bag, the court finds Boyle's request to search the bag was commensurate with the scope of the *Terry* stop. Giroux observed Defendant act in a manner reasonably suggesting Defendant had turned to the back seat of his vehicle to retrieve a weighted object containing "baggies" of narcotics. Thus, Boyle's request to search the bag (which was visible to all from the backseat of the car) was tailored toward determining whether Giroux's reasonable suspicion was valid. And the request was based on further reasonable suspicion developed by Boyle during the course of the stop. Furthermore, although Boyle prevented Defendant from retrieving the bag himself, "during the course of [a *Terry*] stop, [officers may] take measures that are reasonably calculated to protect themselves or others from harm." *United States v. Rasberry*, 882 F.3d 241, 247 (1st Cir. 2018) (alteration added). Boyle, therefore, did not broaden the scope of the stop by removing the bag from the car himself, as this was a reasonable precaution to protect officer safety. As a result, the request satisfies step-two of the *Terry* inquiry.

   *2.   Voluntary Consent*

In an additional argument for suppressing admission of the gun and drugs found in his duffel bag, Defendant argues he did not voluntarily consent to Boyle's search of the bag. As to consent, the court notes that no party testified Defendant verbally consented to the search; however, "[c]onsent to a search may be express or inferred." *United States v. Reynolds*, 646 F.3d 63, 72 (1st Cir. 2011). Here, Defendant opened his car door and attempted to retrieve the bag following Boyle's request. This type of permissive behavior has previously been found indicative of "consent inferable from conduct." *United States v. Zapata*, 18 F.3d 971, 977 (1st Cir. 1994) ("Appellant freely surrendered the keys to both the doors and the trunk; and it is settled law that the act of handing over one's car keys, if uncoerced, may in itself support an inference of consent to search the vehicle."); *see also United States v. Giampapa*, No. CR 22-10270-RGS, 2024 WL 3163115, at *5 (D. Mass. June 25, 2024) (collecting cases holding the same). Moreover, all the parties (including Defendant) testified it was mutually understood that

Defendant's act of opening the Acura's door and reaching for the back was indicative of consent. While Defendant argues that he only did this because of coercion, this goes to the second element, voluntariness (discussed below), as opposed to the outward inference of consent. Consequently, the court concludes Defendant's consent was inferred from his action of attempting to retrieve the bag.

As to voluntariness, the inquiry is "a question of fact that turns on an evaluation of multiple factors, including the consenting party's age, education, experience, intelligence, and knowledge of the right to withhold consent." *United States v. Villot-Santiago*, 618 F. Supp. 3d 35, 40 (D. Mass. 2022) (quoting *Reynolds*, 646 F.3d at 72-73). Generally, "there is no requirement that the person who gave consent must have been explicitly advised of the right to withhold it" but "there must be more than mere acquiescence in the face of an unfounded claim of present lawful authority." *United States v. Perez-Montanez*, 202 F.3d 434, 438 (1st Cir. 2000) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 234 (1973) and *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968)).

Defendant was approximately 42 years old on November 21, 2022. He graduated from high school and worked two jobs: personal care assistant to his 80-year-old grandmother and coordinator at a local food pantry. Consequently, the court finds Defendant was at minimum of normal intelligence with a history of holding multiple jobs, including a job with substantial responsibility for the life of another person. These factors are indicative of Defendant's ability to refuse consent to search. Moreover, although Defendant testified that the officers threatened to arrest him if he did not consent, the court credits the testimony of Giroux and Fontanella, both of whom were clear no such threat was made. To the contrary, Fontanella and Boyle affirmatively sought to assure Defendant that the encounter was "not like that," meaning not an interaction that would escalate to violence or the threat of violence. While not dispositive, the court finds these reassurances constitute further support for finding that there was "no evidence of threats of violence or serious retaliation [such as arrest] by the officers." *United States v. Jackson*, 608 F.3d 100, 103 (1st Cir. 2010). In addition, Boyle informed

Defendant of his *Miranda* rights before requesting permission to search, and "whether the consenting party was advised of his or her constitutional rights" is an important factor which typically weighs in favor of finding voluntary consent. *United States v. Ramdihall*, 859 F.3d 80, 89 (1st Cir. 2017) (quoting *United States v. Forbes*, 181 F.3d 1, 6 (1st Cir. 1999)). Finally, the presence of only three officers—armed but in plainclothes and in a public area (Dunkin Donuts) during the afternoon—who maintained a conversational demeanor throughout the encounter further counsels in favor of the court's conclusion that Defendant voluntarily consented to the search of the bag. Accordingly, as Defendant was subject to a valid *Terry* stop and voluntarily consented to officers' search of his bag, Defendant's motion to suppress the physical evidence seized on November 21, 2022 is denied.

> **B.    The Incriminating Statements**

Defendant has no supportable claim that his *Miranda* rights were violated on November 21, 2022 while outside his vehicle in the Dunkin Donuts parking lot at 695 Liberty Street. Generally, "[i]t is axiomatic that prior to a custodial interrogation, police must inform a person of their *Miranda* rights." *United States v. Vick*, -- F. Supp. 3d --, No. 4:23-CR-40003-MRG, 2024 WL 3553107, at *8 (D. Mass. July 26, 2024). "Custodial interrogation requires that the defendant was both in custody and subjected to interrogation." *Jackson*, 544 F.3d at 356.

As to the interrogation requirement, the court finds Boyle's questions would constitute an interrogation for *Miranda* purposes. "Interrogation for *Miranda* purposes includes 'any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *United States v. Sanchez*, 817 F.3d 38, 44 (1st Cir. 2016) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). Accepting Boyle's testimony that his initial question was regarding the smell of marijuana, this question was an attempt to elicit an incriminating response from Defendant. While simply using or possessing marijuana is not illegal in Massachusetts, operating a motor vehicle under the influence of the substance is a crime. *See* Mass. Gen. Laws ch. 90,

§ 24(1)(a)(1). As Boyle had observed Defendant driving and intercepted Defendant just as he was exiting his vehicle, Boyle (or any hypothetical police officer) should have reasonably expected that his marijuana question would illicit incriminating information. However, interrogation alone is not enough to justify suppression.

As to the custody requirement, Defendant was not in custody in the Dunkin Donuts parking lot.[13] Because the 'temporary and relatively nonthreatening detention involved in a traffic stop or *Terry* stop does not [automatically] constitute *Miranda* custody," *Howes v. Fields*, 565 U.S. 499, 510 (2012) (quoting *Maryland v. Shatzer*, 559 U.S. 98, 113 (2010)), the court must determine "whether an otherwise valid *Terry* stop escalated into a *de facto* arrest necessitating the administration of *Miranda* warnings." *United States v. Trueber*, 238 F.3d 79, 93 (1st Cir. 2001). A valid *Terry* stop becomes a *de facto* arrest when the individual stopped is "subjected to restraints comparable to those associated with a formal arrest." *Id.* (quoting *Berkemer v. McCarty*, 468 U.S. 420, 441 (1984)).

In determining whether a *Terry* stops becomes a *de facto* arrest, the First Circuit has directed courts to apply the familiar "two-step process" used to determine whether an interrogation is custodial

---

[13] The First Circuit has not definitively resolved who has the burden of demonstrating custody. However, the majority of courts to consider the issue have "assigned the burden of proof to the defendant seeking to challenge the admissibility of statements in the absence of a formal arrest." *United States v. Peck*, 17 F. Supp. 3d 1345, 1353-54 (N.D. Ga. 2014) (collecting cases from the Fifth Circuit, the Sixth Circuit, the Eighth Circuit, the Eleventh Circuit by virtue of its adoption of pre-1981 Fifth Circuit case law, the Eastern District of New York, the District of Vermont, and the Eastern District of California holding the same); *accord United States v. Diaz-Lopez*, No. CR 21-157 (RAM-MDM), 2023 WL 6439279, at *15 n. 13 (D.P.R. Oct. 3, 2023) (collecting cases); *United States v. Hines*, No. 1:12-CR-00204-JAW, 2013 WL 1149310, at 3-4 (D. Me. Mar. 1, 2013), *report and recommendation adopted*, No. 1:12-CR-00204-JAW, 2013 WL 1149305 (D. Me. Mar. 19, 2013) (noting the lack of applicable First Circuit law, citing *United States v. Charles*, 738 F.2d 686, 692 (5th Cir. 1984), as persuasive authority for the defendant bearing the burden of persuasion); *United States v. Foley*, 595 F.Supp.2d 171, 177 (D. Mass. 2009) (citing *Charles*, 738 F.2d 686, for the same proposition). Here, the result would be the same regardless of who bore the formal burden of demonstrating custody. The government provided ample evidence Defendant was not in custody while outside the Acura. Conversely, Defendant failed to provide sufficient evidence to demonstrate he was in custody while outside the Acura.

in nature. *United States v. Cruz-Rivera*, 14 F.4th 32, 48 (1st Cir. 2021). "First, it must be determined whether, based on the objective circumstances surrounding the interrogation, a reasonable person would have felt free to terminate the interrogation and leave." *United States v. Monson*, 72 F.4th 1, 10 (1st Cir. 2023). "Second, if it is determined that a reasonable person would not feel free to do so, it must then be determined whether the environment in which the interrogation occurred present[ed] the same inherently coercive pressures as the type of station house questioning at issue in *Miranda.*" *Id.* (internal quotation marks omitted). "The First Circuit has identified several factors relevant when assessing custody, including: 'the setting of the interrogation, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation.'" *United States v. Benoit*, -- F. Supp. 3d --, No. CR 3:22-30014-MGM, 2024 WL 869465, at *5 (D. Mass. Feb. 29, 2024) (quoting *Monson*, 72 F.4th at 10); *see also United States v. Melo*, 954 F.3d 334, 339-40 (1st Cir. 2020). These factors are not exhaustive; consequently, a finding of custody must be based on the totality of the circumstances. *Melo*, 954 F.3d at 340.

Based on the testimony presented to the court, a reasonable person would have felt free to terminate the interaction with officers. While Fontanella and Boyle did testify Defendant was being detained, a "finding of custody 'depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.'" *Melo*, 954 F.3d at 340 (quoting *Stansbury v. California*, 511 U.S. 318, 323 (1994) (per curiam)). This testimony regarding the subjective intentions of Fontanella and Boyle, while subject to consideration, is not determinative relative to the custody analysis. But even if the court found a reasonable person would not have considered themselves entirely free to leave, *Terry* entitled the officers to briefly detain Defendant to an extent proportionate to the scope of the stop. *United States v. Harrington*, 56 F.4th 195, 200-01 (1st Cir. 2022). And, here, the totality of the circumstances does not support a finding that the degree of restraint imposed constituted *de facto* arrest. For example, officers spoke to Defendant in a

neutral setting—a Dunkin Donuts parking lot. *See, e.g., United States v. Campbell*, 741 F.3d 251, 267 (1st Cir. 2013) (noting an interview in a hotel parking lot weighs against finding custody). While multiple officers were congregated in a nearby parking lot that was within Defendant's line of sight, only three officers directly spoke to the Defendant. This "police-to-suspects ratio was [not] overwhelming to [Defendant]." *Id.* (alteration added); *see also United States v. O'Neal*, 17 F.4th 236, 241 (1st Cir. 2021) ("The number of officers present—three in the room itself, with an additional two outside—was undoubtedly concerning, but not so overwhelming as to establish custody by itself."). Moreover, Defendant was not handcuffed, officers did not draw their firearms, officers did not threaten to arrest Defendant on the spot, and the entire interaction lasted approximately thirty minutes. *See, e.g., United States v. Hughes,* 640 F.3d 428, 437 (1st Cir. 2011) (concluding a ninety-minute interview does not support finding of custody); *United States v. Nishnianidze*, 342 F.3d 6, 14 (1st Cir. 2003) (noting that lack of restraints supports finding interview is not custodial); *but see United States v. Mittel-Carey,* 493 F.3d 36, 40 (1st Cir. 2007) (explaining the presence of an unholstered gun and agents use of a significant degree of physical control weighs in favor of custody).

Finally, the character of the interaction does not support a finding of custody. It was only a matter of minutes between the time Boyle initiated the investigatory stop and the time Boyle recited the *Miranda* warnings. During this brief period, officers only made three statements that could plausibly be construed as questions posed to the Defendant: (1) Boyle asked Defendant about either the smell of Marijuana or his inspection sticker, (2) Giroux asked Defendant for his license, and (3) Fontanella asked Defendant what he had done that day. When viewed in isolation, the first question posed by Boyle might be viewed as supporting a finding of custody. But custody "cannot be viewed in a vacuum." *Hughes*, 640 F.3d at 437. The latter two questions are measurably more innocuous and therefore provide no support for a finding of custody. *See, e.g., United States v. Lara,* No. 1:23-CR-10207-ADB, 2024 WL 3293895, at *5 (D. Mass. July 3, 2024) ("Lara was asked mundane questions .

. . . Accordingly, Lara's motion to suppress statements made during the Lara Vehicle Stop is denied." (citations omitted)). And, when, as here, a "number of other circumstances point in the opposite direction," the court finds the sole fact favoring custody is heavily outweighed by those facts counseling against a finding of custody. *Hughes*, 640 F.3d at 437. Accordingly, Defendant was not in custody while outside his Acura in the Dunkin Donuts parking lot, rendering the statements he made in the parking lot admissible.

But, once Defendant was placed in the DEA vehicle, he was in custody because a "reasonable man would [no longer] have believed only that he was being detained for investigation, not placed under arrest." *United States v. Quinn*, 815 F.2d 153, 158 (1st Cir. 1987) (alteration added). While the officers did not tell Defendant he was under arrest, they also did not tell him he was free to leave. It would have been readily apparent to the average person that officers finding substantial quantities of illegal narcotics and an illegal firearm would constitute grounds for arrest. Consequently, moving the interrogation to the confines of Fontanella's car, an enclosed environment where Defendant was outnumbered two to one, "was in the nature of interrogation along the 'broad spectrum from a speeding ticket to a grilling in the squad room.'" *United States v. Grubert*, 605 F. Supp. 3d 171, 177 (D. Mass. 2022) (quoting *Cruz-Rivera*, 14 F.4th at 51); *cf. United States v. Molina-Gomez*, 781 F.3d 13, 22-23 (1st Cir. 2015) (finding custody during secondary customs inspection because of enclosed space, presence of two officers, and "probing questions about potential illegal activity"). Moreover, the apparent scope of the discussion in the car, involving the nature of Defendant's involvement in the greater Springfield drug trade with an eye to securing Defendant's future cooperation, went beyond the bounds of the initial *Terry* stop. Officers had sufficiently investigated (and in fact confirmed) the reasonable suspicion that justified the *Terry* stop. Therefore, "the relevant environment present[ed] [became] the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*," as the DEA sought to elicit further incriminating information with a view to exploiting

potential cooperation between Defendant and the federal government. *Melo*, 954 F.3d at 340 (quoting *Howes*, 565 U.S. at 509) (alteration added); *see also United States v. West*, 552 F. Supp. 2d 74, 81, 83 (D. Mass. 2008) (discussing the centrality of "flip[ing]' those facing long prison terms into working for [the government] as informants against other wrongdoers in hopes of a reduced sentence" to modern narcotics investigations (alterations added)), *aff'd*, 631 F.3d 563 (1st Cir. 2011). The court, therefore, concludes Defendant was in custody when he was placed in Fontanella's car

As Defendant was in custody once placed in the DEA vehicle, his statements are admissible only if they were the product of a knowing and voluntary waiver of his *Miranda* rights.[14] "The prosecution bears the burden of proving, at least by a preponderance of the evidence, the *Miranda* waiver . . . and the voluntariness of the confession." *Missouri v. Seibert*, 542 U.S. 600, 608 n. 1 (2004) (internal citation omitted); *United States v. Carpentino*, 948 F.3d 10, 25-27 (1st Cir. 2020). And, as "[t]he requirement of warnings and waiver of rights is a fundamental with respect to the Fifth Amendment privilege and not simply a preliminary ritual to existing methods of interrogation," *United States v. Gonzalez*, 719 F. Supp. 2d 167, 171 (D. Mass. 2010) (quoting *Miranda,* 384 U.S. at 476), the government cannot meet its "heavy burden" simply by "establish[ing] that a *Miranda* warning was

---

[14] The question of consent under the Fourth Amendment and waiver under the Fifth Amendment are distinct. *See Lopera v. Town Of Coventry*, 640 F.3d 388, 399 (1st Cir. 2011) ("We are unaware of any published circuit court decision that applies this standard for voluntariness of a confession to questions of consent under the Fourth Amendment."); *see also United States v. O'Brien,* 926 F.3d 57, 75 (2d Cir. 2019) ("The analysis required to determine whether consent to search was given freely and voluntarily, however, differs somewhat from the above Fifth Amendment analysis as to whether the post arrest right to remain silent was 'knowingly' and voluntarily waived, for '[t]here is a vast difference between those [Fifth Amendment truth-seeking] rights that protect a fair criminal trial and the rights guaranteed under the Fourth Amendment.'" (quoting *Schneckloth*, 412 U.S. at 241) (alteration in original)); *United States v. Griffin*, 431 F. Supp. 2d 164, 169-170 (D. Mass. 2006) ("As both an empirical matter and a legal matter, the Miranda rights waiver and the consent search waiver, are distinct and separable events."). Consequently, the court's finding that Defendant consented to the search of his bag does not control its analysis on the issue of *Miranda* waiver.

given and the accused made an uncoerced statement," *see id.* at 171 (quoting *Berghuis v. Thompkins*, 560 U.S. 370, 383 (2010) (alteration added)).

Here, even though there was no custodial interrogation while the parties were standing in the parking lot, the *Miranda* warnings were given, meaning the incriminating statements Defendant made in the car could arguably be framed as admissible. But the government would need to prove Defendant waived his *Miranda* rights by a preponderance of the evidence. It has not done so, as the court was not presented with any evidence that Defendant knowingly and voluntarily relinquished his *Miranda* rights or that Defendant verified his understanding of the rights he was giving up. Rather, the testimony uniformly indicated Defendant never stated he understood his rights, he never verbally informed officers he was waiving his rights, and officers did not obtain a signed *Miranda* waiver. It is true waiver can be implied from a course of conduct, but "[t]he prosecution must [still] make the additional showing that the accused understood these rights." *Berghuis*, 560 U.S. at 385 (alteration added). The government has not introduced evidence sufficient to make this additional showing. Consequently, any incriminating statements Defendant made in the DEA vehicle are suppressed.

In summary, the court (i) declines to suppress the physical evidence seized by officers on November 21, 2022, (ii) declines to suppress Defendant's incriminating statements made outside of his Acura, but (iii) deems the incriminating statements made inside Special Agent Fontanella's car inadmissible because the government failed to prove Defendant knowingly and voluntarily waived his *Miranda* rights by a preponderance of the evidence.

## IV. CONCLUSION

For the reasons set forth above, Defendant's motion to suppress (Dkt. No. 37) is GRANTED IN PART and DENIED IN PART.

It is So Ordered.

_/s/ Mark G. Mastroianni_
MARK G. MASTROIANNI
United States District Judge